UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SILHOUETTE GOMEZ, | No. 1:18-cv-00881-GSA |
| Plaintiff, | |
| v. | **ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |
| ANDREW SAUL,[1] Commissioner of Social Security, | |
| Defendant. | |

## I.     <u>Introduction</u>

Plaintiff Silhouette Gomez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II and supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[2]  *See* Docs. 21 and 22.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

---

[1] Commissioner of Social Security Andrew Saul is substituted as Defendant pursuant to Fed. R. Civ. P. 25(d).  *See also* Section 205(g) of the Social Security Act, 42 USC 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).
[2] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.

## II. Procedural Background

On January 19, 2013, Plaintiff filed applications for disability insurance benefits and supplemental security income alleging disability beginning December 31, 2012. AR 123, 134, 175. The Commissioner denied the applications initially on May 23, 2013, and upon reconsideration on November 26, 2013. AR 133, 144, 157, 168. On November 30, 2013, Plaintiff filed a request for a hearing before an Administrative Law Judge. AR 175.

Administrative Law Judge Cynthia Floyd presided over an administrative hearing on July 29, 2015. AR 68-122. Plaintiff appeared and was represented by an attorney. AR 68. Impartial vocational expert Robin Genereax also testified. AR 68.

On September 10, 2015, ALJ Floyd granted Plaintiff's application. AR 175-82. Because Plaintiff was undergoing treatment and her condition was expected to improve, ALJ Floyd recommended a continuing disability review in twelve months. AR 182.

On November 5, 2015, the Appeals Council notified the parties of its intent to review the hearing decision. AR 282-89. On February 19, 2016, the Appeals Council vacated the hearing decision and remanded the case for further proceedings. AR 185-91.

On October 31, 2017, ALJ Joyce Frost-Wolf presided over the administrative hearing of the remand. AR 38-67. Plaintiff appeared and was represented by an attorney. AR 38. Impartial vocational expert Stephen B. Schmidt also testified. AR 38.

On December 6, 2017, ALJ Frost-Wolf issued a hearing decision denying Plaintiff's applications. AR 15-28. The Appeals Council denied review on April 23, 2018. AR 1-4. On June 27, 2018, Plaintiff filed a complaint in this Court. Doc. 1.

## III. Factual Background

### A. Plaintiff's Testimony

#### 1. July 2015

At the first agency hearing on July 29, 2015, Plaintiff (born October 28, 1976) was living

with her partner[3] and her sons aged 3, 4, 8 and 17 years.[4]  AR 72.  Although Plaintiff had a driver's license, driving made her anxious and she preferred to have her partner or her teen-aged son drive her or run errands for her.  AR 75-76.

Plaintiff was approximately five foot, three inches tall and weighed 230 pounds.  AR 73. Although her weight had fallen from 267 pounds following lap band surgery, Plaintiff was still obese and still had type 2 diabetes and high cholesterol.  AR 73-74. She experienced chronic migraines that lasted for two or three days, and occurred three to five times per month.  AR 90. On three occasions, Plaintiff sought emergency room treatment for her migraines receiving morphine shots before returning home to rest in a dark room.  AR 93.  Plaintiff also had chronic back problems and sciatica that shot pain down her right leg and sometimes made her unable to walk.  AR 90.  Her right arm tingled.  AR 90.  She had high blood pressure, severe depression, asthma and anxiety.  AR 91, 95-96, 104.  Plaintiff reported suicidal ideation and multiple suicide attempts, which she attributed to her life experiences which included being sexually assaulted as a child.  AR 104-05.

Plaintiff drank from four to eight glasses of wine daily to "make [her] body feel a little loose."  AR 109-10.  She did not know if her drinking affected her mentally.  AR 110.  Plaintiff had received no treatment for her alcohol use.  AR 110.  Plaintiff thought that if she stopped drinking she would be tense and in pain.  AR 111.  She stated, "I don't see myself stopping drinking."  AR 111.

For about three months in 2013, Plaintiff did office work and fundraising for her mother's business, Emmanuel Outreach Ministries.  AR 79-80.  Plaintiff's mother, who owned the church and was its pastor, permitted Plaintiff to work flexible hours when she felt well.  AR 79-80. Plaintiff reported self-employment wages received from the church for many years.  AR 82, 88.

Before becoming ill in 2012, Plaintiff worked for Merced Community College doing filing and data entry in the billing department.  AR 81-82.  For approximately five years she

---

[3] On various occasions, Plaintiff referred to the man with whom she lived as her partner, boyfriend and husband, and referred to herself as single or married.  There is no apparent pattern to her characterization of her relationship status nor can the Court be certain that all such references concern the same individual.
[4] Plaintiff had a fifth son who was not living at home on the hearing date.  *See* AR 368, 700, 746.

provided IHSS in-home care for her mother, who was then seriously ill. AR 82-83. She also worked for recruitment services companies and sold tickets for the ferry from Long Beach to Catalina Island. AR 83-84.

Plaintiff testified that she had attended special education classes throughout school due to a learning disability (catatonia). AR 77. She had a business degree from Merced Community College. AR 77. Plaintiff had difficulty concentrating, reading and doing math. AR 77-78.

## 2. **October 2017**

Plaintiff's testimony at the October 2017 remand hearing was generally consistent with her testimony in July 2015. Plaintiff's attorney emphasized that Plaintiff's condition had worsened in the interim. AR 42-43. Specifically, Plaintiff's physicians had prescribed lithium, identified mild degenerative changes of Plaintiff's spine and referred her for pain management. AR 42-43. Plaintiff needed a cane or a walker to get around. AR 54. She wore a back brace and used a TENS unit daily. AR 55. Cortisone shots relieved but did not eliminate her back pain. AR 55-56. Her medications caused memory loss. AR 53-54.

With the help of her cane, Plaintiff could stand in one place for five minutes. AR 59. She could sit comfortably for about 30 minutes. AR 60. Although Plaintiff could not walk a block, she testified that she needed always to be in motion. AR 60-61.

Plaintiff's debilitating migraines continued. AR 62. She needed to lie down when she took her medications. AR 62. Her depression caused a "breakdown" at least once a week. AR 61. When Plaintiff experienced a breakdown she isolated herself, cried, began suicidal ideation and needed to call her therapist or the suicide prevention hotline. AR 61.

Plaintiff testified that because of her migraines and intense pain she was no longer able to work at Emmanuel Outreach Ministries. or to perform any household chores. AR 49, 51. She experienced back spasms that caused her to fall in stores. AR 52.

Her partner was home during the day and able to help her care for the children. AR 53. Plaintiff was able to sit on the bed with her younger children (aged 5, 6 and 10), snuggling, reading, watching television and playing games. AR 45, 53.

///

4

## B.    Plaintiff's Adult Function Reports

In an adult function report dated April 3, 2013, Plaintiff claimed she experienced cervical cancer, respiratory illnesses (asthma), vision loss, mental disorders (depression and anxiety), diabetes, regular severe migraine headaches, "pass[ing] out," hair loss, disorientation and high blood pressure.  AR 489.  Her impairments affected lifting, bending, walking, sitting, stair-climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions and getting along with others.  AR 494.  She had no trouble dealing with authority figures or co-workers.  AR 495.  Her medications were Topiramate,[5] Paroxetine,[6] Sumatriptan,[7] and propranolol.[8]  AR 496.

On a typical day, Plaintiff cared for her children and prepared meals.  AR 490.  She had no problem with personal care.  AR 490.  She regularly did laundry but needed help lifting and carrying.  AR 491.  Plaintiff tried to go outside each day but had to be careful because she sometimes "black[ed] out."  AR 492.  She shopped for three hours at a time about four times monthly, and could manage her own finances.  AR 492.  Plaintiff had no time to socialize and was too sick to enjoy her former hobbies of hiking, running, playing ball, reading and watching television.  AR 493.

In an undated report prepared after January 25, 2013, Plaintiff reported severe migraine headaches, frequent loss of vision, depression, anxiety and isolation.  AR 560.  She had recently been diagnosed with fibromyalgia but had not taken the medication prescribed for it.  AR 560.  Plaintiff was seeing a counselor to address her depression and bipolar disorder.   AR 560. She

///

---

[5] Topiramate (Topamax) is an anticonvulsive used to treat certain types of seizures and migraine headaches.  www.medlineplus.gov/druginfo/meds/a697012.html (accessed October 8, 2019),

[6] Paroxetine is a selective serotonin-reuptake inhibitor prescribed to treat depression, panic disorder, social anxiety disorder and other psychological symptoms.  www.medlineplus.gov/druginfo/meds/a698032.html (accessed October 8, 2019).

[7] Sumatriptan is a selective serotonin receptor agonist prescribed to alleviate the symptoms of migraine headaches.  .  www.medlineplus.gov/druginfo/meds/a601116.html (accessed October 8, 2019).

[8] Propranolol is prescribed for various purposes including high blood pressure and migraine headaches.  .  www.medlineplus.gov/druginfo/meds/a682607.html (accessed October 8, 2019).

added that she was diagnosed ADD/ADHD and learning disabled (dyslexia). AR 561. She read below the sixth-grade level. AR 561.

In an undated report prepared after June 24, 2013, Plaintiff reported that her condition continued to deteriorate. AR 550. She was experiencing visual hallucinations and had become isolated. AR 550. She had neck tension and a pinched nerve in her back. AR 550. Because sunlight triggered her migraines, Plaintiff was staying inside. AR 550. She continued to lose her hair and black out. AR 551. She was in severe pain and sick with asthma. AR 550. Her prescription medications were Vitamin D, Paroxetine, Topiramate, Abilify[9] and Gabapentin.[10] AR 550. Plaintiff was having trouble sleeping. AR 557. She struggled with personal care, cooked infrequently and no longer did the laundry. AR 557.

In or about April 2015, Plaintiff's prescription medications included Clonazepam,[11] Abilify, Paroxetine, Propranolol, Topiramate, Gabapentin, Metformin,[12] Vitamin D, Ventolin HFA,[13] QVAR[14] and Tylenol Extra Strength.[15] AR 585.

In August 2017, Plaintiff reported that her prescription medications included Vitamin D-3,

---

[9] Abilify (Aripiprazole) is an atypical antipsychotic prescribed to treat symptoms of schizophrenia, mania or mixed episodes, bipolar disorder and depression. www.medlineplus.gov/druginfo/meds/a603012.html (accessed October 8, 2019).

[10] Gabapentin is an anticonvulsant prescribed to control certain types of epileptic seizures and to relieve the pain of postherpetic neuralgia (shingles). www.medlineplus.gov/druginfo/meds/a694007.html (accessed October 8, 2019).

[11] Clonazepam is a benzodiazepine prescribed to control certain types of seizures and to relieve panic attacks. . www.medlineplus.gov/druginfo/meds/a682279.html (accessed October 8, 2019).

[12] Metformin is a biguanide prescribed to treat Type 2 diabetes. . www.medlineplus.gov/druginfo/meds/a696005.html (accessed October 8, 2019).

[13] Ventolin is an albuterol inhaler prescribed to treat symptoms of asthma. www.medlineplus.gov/druginfo/meds/a682145.html (accessed October 8, 2019).

[14] QVAR (Beclomethasone) is an aerosol inhaler prescribed to control symptoms of asthma. . www.medlineplus.gov/druginfo/meds/a681050.html (accessed October 8, 2019).

[15] Tylenol (Acetaminophen) is an analgesic prescribed to relieve mild to moderate pain. . www.medlineplus.gov/druginfo/meds/a681004.html (accessed October 8, 2019).

Topamax, Tramadol,[16] Lyrica,[17] Propranolol, Abilify, Lithium,[18] Paroxetine, Temazepam,[19]

Sumatriptan, Clonazepam, and Lidocaine patches.[20]  AR 617.

### C.  Third-Party Adult Function Reports

On April 4, 2013, Plaintiff's sister, Charlotte Lee Dee, completed a third-party adult

function report.  AR 475-83.  Although Ms. Dee lived in Las Vegas, Nevada, she reported that

she spent one week each month with Plaintiff and her family.  AR 475, 483.  On each visit, Ms.

Dee saw Plaintiff in "excruciating pain to where she's in tears, unfocused to the point of passing

out."  AR 475.  Plaintiff performed her own personal care and prepared food for her children but

otherwise remained in her bed.  AR 476.  Plaintiff was able to cook, straighten up and do laundry.

AR 477.  Plaintiff could handle money and shopped about once weekly for food and clothing.

AR 478.  Plaintiff had difficulty lifting, bending, talking, hearing, seeing, completing tasks,

concentrating, understanding, following instructions and getting along with others.  AR 480.

Plaintiff got along well with authority figures and co-workers and was able to adapt to changes in

routine.  AR 481.  She did not handle stress well.  AR 481.

In an unsigned letter dated September 1, 2017, "Emmanuel Outreach Ministries" reported

that in 2016 Plaintiff performed light volunteer services including filing papers, preparing

sandwiches, organizing extravaganzas for the holidays and as her health permitted, visiting hotels

and motels to discuss with management Emmanuel's goals and services for homeless persons

housed there.  AR 625.

---

[16] Tramadol is an opiate (narcotic) analgesic prescribed to relieve moderate to moderately sever pain in patients expected to need pain relief around the clock.  www.medlineplus.gov/druginfo/meds/a695011.html (accessed October 8, 2019).

[17] Lyrica (Pregabalin) is an anticonvulsant prescribed to relieve neuropathic pain.  .5www.medlineplus.gov/druginfo/meds/a604045.html (accessed October 8, 2019).

[18] Lithium is an antimanic agent prescribed to prevent episodes of mania in persons with bipolar disorder.  .www.medlineplus.gov/druginfo/meds/a681039.html (accessed October 8, 2019).

[19] Temazepam is a benzodiazepine prescribed on a short-term basis to treat insomnia.  .www.medlineplus.gov/druginfo/meds/a684003.html (accessed October 8, 2019).

[20] Lidocaine is a local anesthetic prescribed to relieve the pain of post-herpetic neuralgia.  .www.medlineplus.gov/druginfo/meds/a603026.html (accessed October 8, 2019).

1    Plaintiff's friends Trini Brookins, Reyna Gomez and Shelly Jane McLaughlin wrote

2    letters on Plaintiff's behalf attesting to Plaintiff's good character and medical symptoms.  AR

3    627-29, 631-33,635-36

### D.    Medical Records

5    On March 26, 2012, Plaintiff 's youngest son was delivered by Caesarian section.  AR

6    649.  Although Plaintiff had experienced gestational diabetes, her blood glucose was in the

7    normal range at her son's birth.  AR 649.  Other than Plaintiff's self-report of a Metformin

8    prescription, no evidence of treatment for diabetes appears within the record for the time period

9    relevant to Plaintiff's disability applications.  Testing results of Plaintiff blood glucose and

10   hemoglobin A1c were consistently within the normal range.[21]  *See* AR 1059 (A1c = 6.0), 1062

11   (blood glucose = 88), 1105 (blood glucose=82), 1423 (A1c = 5.7), 1424 (blood glucose = 95).

12   Nearly all of Plaintiff's medical care was provided by Golden Valley Health Centers,

13   Merced, California.  During an office visit in October 2012, Plaintiff reported that she

14   experienced migraines following meningitis at age 12, but had been migraine-free for many years

15   until the migraines resumed after a 2006 motor vehicle accident.  AR 675.  Plaintiff received no

16   medical care following the accident.  AR 675.  Plaintiff reported no depression, anxiety or pain.

17   AR 676.  Plaintiff's gait and range of motion were normal, and the examination revealed no joint

18   swelling or muscle weakness.  AR 676.  Prescription medications were naproxen and propranolol.

19   AR 678.

20   On November 29, 2012, Dinesh Chhaganlal, M.D., noted that Plaintiff's migraine

21   headaches had resumed when she began taking propranolol.  AR 684.  The doctor diagnosed

22   "common migraine without mention of intractable pain."  AR 684.

23   ///

24   ///

25

---

26   [21] Normal blood glucose levels (fingerstick testing) range from 65 mg/dl (low) to 99 mg/dl (high).  AR 1062.
     Hemoglobin A1c is a blood test for type 2 diabetes and prediabetes.  Because the test measures the patient's average
27   blood glucose level over the past three months, it indicates how well the patient is managing his or her diabetes.  The
     A1C level is a percentage.  Normal readings are 5.7 percent or below.  Prediabetes is 5.7 to 6.4 percent.  Type 2
     diabetes is above 6.5 percent.  The goal for diabetic patients is to maintain an A1C percentage below 7 percent.
28   www.medlineplus.gov/a1c.html (accessed September 11, 2019).

In January 2013, Eduardo Villarama, M.D., noted moderately severe migraine headaches with pain rated 2/10. AR 688. Dr. Villarama added prescriptions for Topamax, midodrine and Paxil. AR 691.

In May 2013, Plaintiff saw therapist Rosalba Serrano, L.C.S.W., and reported a diagnosis of bipolar disorder and depression. AR 719-20. Plaintiff denied current thoughts of death or suicide but reported that she had attempted suicide in 2002. AR 719.

In June 2013, Plaintiff saw Walter Kip Johnson, M.D., and asked him to increase her Paxil prescription. AR 725. Plaintiff "also requested Lyrica for self-diagnosed fibromyalgia." AR 725. Following discussion, Dr. Johnson increased Plaintiff's Paxil dosage but left all other medications unchanged. AR 725. In a follow-up appointment with Mayla T. Carlos, P.A., about a week later, Plaintiff reported that the new Paxil dosage had helped Plaintiff's anxiety. AR 729.

Plaintiff continued half-hour therapy sessions with Ms. Serrano from May 22, 2013 through January 22, 2015. AR 733-34, 739-40, 746-47, 753-54, 755-56, 886-89, 895-96, 904-05, 921-22, 926-27, 941-42, 950-51, 956-59, 964-67. Plaintiff reported a history of anger, rages and black-outs and complained of increased anxiety, fatigue, hypersomnia, crying, irritability, mood swings and visual hallucinations. AR 739-40. She spoke of marital problems and her children's misbehavior. AR 733-34, 739-40, 746-47, 753-54, 755-56. Plaintiff acknowledged that taking walks and keeping busy helped her mood. AR 904.

In July 2013, Plaintiff asked Dr. Villarama to evaluate her for fibromyalgia. AR 741. In August 2013, Plaintiff told Dr. Villarama that her migraines had worsened in the warm weather but that she had not visited the emergency room. AR 748. Dr. Villarama increased Plaintiff's prescriptions for Topamax and Gabapentin. AR 751.

On January 7, 2014, Plaintiff saw Amy Dieu, R.D., for a lap band nutrition evaluation. AR 947-49. Plaintiff weighted 232.5 pounds. AR 948. Ms. Dieu recommended bariatric surgery with ongoing nutrition support and counseling. AR 948.

On February 14, 2014, Plaintiff told Christopher Barrett, P.A., that her migraines had worsened, with pain at 6/10. AR 943. The headaches were associated with stress and were

///

9

relieved by prescription medications.  AR 943.  Mr. Barrett noted inappropriate mood and affect.  AR 945.

On March 14, 2014, Plaintiff told Ms. Serrano of increased depression, anxiety and urges to cut herself.  AR 941.  She was hearing "inner voices."  AR 941.

On March 24, 2014, Mr. Barrett noted that because Plaintiff was not complying with the prescribed diet, she continued to gain weight.  AR 936.  Plaintiff wanted to pursue bariatric surgery.  AR 936.  She complained of continued migraine headaches.  AR 936.

At a psychiatric intake interview on March 26, 2014, psychiatrist Cynthia Hunt, M.D., noted Plaintiff's primary care physician and therapist had referred Plaintiff for treatment of anxiety and depression.  AR 932.  Plaintiff recounted a 10-year history of anxiety and depression with no obvious cause.  AR 932.  Plaintiff also complained of sleep difficulties, excess energy, mood swings and auditory and visual hallucinations. AR 932.  Plaintiff recounted a prior diagnosis of bipolar disorder, three previous suicide attempts, trials of many medications, a history of cutting and self-injury, severe domestic abuse by a prior husband, and multiple rapes during her childhood.  AR 932-33.  Plaintiff had served two prison terms, both of which she blamed on the behavior of others.  AR 933.  Dr. Hunt diagnosed bipolar disorder.  AR 934.

On April 1, 2014, Plaintiff told Mr. Barrett that she was experiencing auditory and visual hallucinations despite taking Abilify.  AR 928.  Mr. Barrett increased Plaintiff's Abilify dosage from 10 mg to 15 mg daily.  AR 930.

On April 4, 2014, Plaintiff told Ms. Serrano that despite the recent change in the dosage of Abilify, Plaintiff was experiencing depressed mood, lack of interest in performing daily activities, difficulty with personal care, poor concentration, forgetfulness, fatigue and agitation.  AR 926.  Visual hallucinations were gone; auditory hallucinations (voices) had decreased.  AR 926.

On April 2014, Dr. Hunt noted that the increased dosage of Abilify had reduced Plaintiff's visual and auditory hallucinations, but her fatigue and sleep difficulties continued.  AR 923.

In May 2014, Mr. Barrett noted that Plaintiff's headaches and anxiety were both well controlled.  AR 909.

///

In July 2014, Plaintiff told Mr. Barrett that her headaches had worsened with pain rated at 6/10.  AR 890.  Plaintiff had stopped exercising and was sleeping from 10:00 p.m. to 10:30 a.m. the following morning.  AR 890.

Plaintiff was in a good mood when she saw psychiatrist R. David Simenson, M.D., in October 2014.  AR 861.  Her son's military station had changed from Georgia to California, and Plaintiff took a three-day trip to a friend's wedding.  AR 861.  Plaintiff reported sleeping well but feeling tired.  AR 861. .

After observing Plaintiff's increased symptoms in November 2014, Dr. Hunt suspected schizoaffective disorder and increased Plaintiff's Abilify dosage.  AR 853.  On January 9, 2015, Dr. Hunt noted that although Plaintiff continued to wake during the night, Abilify had reduced Plaintiff's anxiety.  AR 845.  Dr. Hunt observed that Plaintiff was verbal and cooperative with improved mood and affect.  AR 845.

On January 23, 2015, Antonio Coirin, M.D., performed laparoscopic bariatric surgery to place an adjustable gastric band (lap band).  AR 790-92.  On the date of surgery, Plaintiff weighed 255 pounds. AR 793.

On February 11, 2015, Plaintiff reported seeing shadows in her peripheral vision.  AR 837.  Dr. Simenson observed anhedonia, anxiety and hopelessness, and noted that Plaintiff reported depression but smiled.  AR 840.

On February 20, 2015, Mr. Barrett noted that Plaintiff's migraines were mild with pain rated 3/10.  AR 831.  Mr. Barrett reduced Plaintiff's Propranolol prescription and encouraged her to exercise 30 to 60 minutes five to six days weekly.  AR 834.

On June 19, 2015, Plaintiff was treated in Golden Valley's Urgent Care center for a severe migraine (10/10) that affected her vertex, frontal and temporal lobes and caused blurred vision, dizziness, nausea and vomiting.  AR 1414.  Bounlath Souksavong, P.A., administered Toradol and an injection of Keterolac.[22]  AR 1416.  On June 23, 2015, Plaintiff saw Mr. Barrett to report ///

---

[22] Keterolac is a nonsteroidal anti-inflammatory drug used for short-term relief of moderately severe pain. www.medlineplus.gov/druginfo/meds/a693001.html (accessed October 23, 2019).

that her headaches had worsened in the past five days.  AR 1409.  Mr. Barrett adjusted dosages of Plaintiff's prescriptions.  AR 1412-13

When Plaintiff saw psychiatrist R. David Simenson, M.D., on July 31, 2015, she reported that she was being treated by a new therapist at CalWorks.[23]  AR 1399.  Having to explain her past traumas resulted in anxiety attacks, paranoia, mood swings, poor concentration and thoughts of violent and sexual images but no audio or visual hallucinations.  AR 1399.  In September 2015, Plaintiff told Dr. Simenson that she was having good days and some bad days.  AR 1394.

In September 2015, Plaintiff had an initial evaluation for physical therapy.  AR 1008-12.  Therapy was planned to occur twice weekly for six weeks and to include progressive stretching and strengthening, home exercise, progressive gait training, balance training, modalities for pain control, education and manual therapies.  AR 1009.  In December 2015, Plaintiff was discharged from therapy having attended only the initial evaluation and one therapy session.  AR 1006.

In December 2015, Dr. Simenson noted that Plaintiff had not increased her dose of lithium since her insurance would not cover the increased dosage.  AR 1025.  Plaintiff reported experiencing agoraphobia and panic attacks in  stores.  AR 1025.  She was experiencing auditory and visual hallucinations and violent and sexual nightmares.  AR 1025.

Plaintiff again complained of anxiety in January 2016 and asked Dr. Simenson to increase her dosage of clonazepam.  AR 1031.  Plaintiff reported "drinking a lot of energy drinks."  AR 1031.  Plaintiff reported an incident of anger in a shopping mall in which she contemplated using a box cutter to attack an individual who irritated her.  AR 1031.  Her last depressive episode was for two weeks in November.  AR 1031.  As to manic episodes she had talked "real fast' the prior day, had a spending binge in December, and spent money whenever her mother had money in her account.  AR 1031.  Plaintiff was seeing a CalWorks counselor weekly.  AR 1032.

In February 2016, Abhilasha Sharma, M.D., noted that Plaintiff's migraines had worsened.  AR 1036.

///

---

[23] Other than the assessment of Jeremy Brownstein, ACSW, at AR 1082, the record includes no treatment notes from any CalWorks counselor.

In March 2016, chiropractor Marcus R. Bernardi, D.C., noted that Plaintiff's back pain had worsened and was rated 6/10. AR 1042. Plaintiff told Dr. Bernardi that she had experienced back pain since undergoing a spinal tap as a child and that the pain had worsened after the 2006 motor vehicle accident. AR 1042. Bending, changing position, daily activities and sitting aggravated the pain, and nothing, including medication, relieved it. AR 1042. On April 6, 2016, Plaintiff asked Dr. Sharma for a referral to a back specialist for cortisone shots because chiropractic treatment was not helping her back pain. AR 1047. Dr. Sharma recommended that Plaintiff use a heating pad or hot shower to relax her muscles and referred Plaintiff for pain management. AR 1050. On April 7, 2016, Plaintiff told Dr. Bernardi that her back pain was moderate but improving. AR 1052. Dr. Bernardi recommended heat therapy, lower back stretching exercises and short walks daily. AR 1054-55.

On April 26, 2016, radiologist Duane Richey, M.D., reviewed x-rays of Plaintiff's spine. Dr. Richey diagnosed "[s]table mild diffuse degenerative changes." AR 1057.

On May 11, 2016, Plaintiff told Dr. Simenson that she was "OK, pretty much," outlining several relationship and parenting problems. AR 1347.

Beginning May 14, 2016, Plaintiff received pain management from Hai Duong, M.D., at Valley Center for Pain Medicine, Merced, California. At her intake appointment, Plaintiff described constant hot-burning, shooting, stabbing and tingling pain in her lower lumbar region, radiating up her back and down her legs to her toes. AR 1069. Plaintiff's pain was greater on the right side than on the left. AR 1069. Plaintiff said that the pain dated to spinal tap administered when Plaintiff was twelve and worsened after a 2006 motor vehicle accident which left Plaintiff in a coma for a "couple of days." AR 1069. Movement and prolonged standing aggravated the pain. AR 1069. Plaintiff had discontinued taking the Lyrica and Gabapentin prescribed for her because "it was not helping with the pain." AR 1069. Physical therapy had not helped either. AR 1069. Plaintiff also reported migraine headaches, neck pain, shoulder pain, back pain, and chest pain. AR 1069. Although Dr. Duong's examination revealed tender spots, he observed full motor strength and no spinal or muscular abnormalities. AR 1070-71. The doctor recommended physical therapy, a TENS unit and Lyrica. AR 1071. X-rays indicated mild multilevel

13

degenerative changes of the cervical spine most prominent at C5-6 without focal disc protrusion or spinal/neural foraminal stenosis.  AR 1074.  Lumbar magnetic resonance imaging indicated moderate multilevel facet arthropathy with no evidence of disc protrusion or significant encroachment on the spinal canal or neural fora mina.  AR 1075-76.

Plaintiff continued to receive chiropractic care from Dr. Bernardi.  AR 1133-37, 1145-49, 1168-77, 1209-18,1248-52, 1263-67, 1274-78, 1285-94, 1301-05, 1314-18, 1337-46.  In May 2016, Plaintiff reported increased pain after falling on her wet kitchen floor while getting off the treadmill.  AR 1342.

In June 2016, Plaintiff told Dr. Simenson that she was under a lot of stress: recovering from a strep throat, arguing with her mother and her partner, and dealing with large "mutant rats" that had moved into her house.  AR 1325.  Plaintiff again reported shadow-like visual hallucinations.  AR 1326.

After prescribing lithium, Dr. Simenson monitored Plaintiff's blood levels of lithium.  In his July 13, 2016 notes, the doctor included a comment from Dr. Edwards, who questioned whether the startling variation in Plaintiff's blood lithium levels indicated lack of compliance with her medication.  AR 1306.  Dr. Edwards added that if Plaintiff's lithium levels were within the therapeutic range, the lithium was not adequately addressing Plaintiff's manic and psychotic levels.  AR 1306.  If lithium was ineffective, switching to another antipsychotic medication might be advisable.  AR 1306.

In July 2016, Plaintiff told Dr. Duong that her pain had increased to 10/10.  AR 1120.  In September 2016, Plaintiff denied experiencing joint pain but complained that she had rheumatoid arthritis.  AR 1118.

At an appointment with Cynthia Chan, P.A., on July 20, 2016, Plaintiff complained of joint pain, numbness, weakness, wrist locking and wrist tenderness and requested a referral for treatment of carpal tunnel syndrome.  AR 1295.

On August 30, 2016, Plaintiff told Dr. Simenson that she had a hallucination of a woman walking about Plaintiff's house with a knife.  AR 1279.  Plaintiff stated that she was drinking one glass of wine daily and using no other substances.  AR 1280.

On November 1 and 2, 2016,[24] Plaintiff had an initial behavioral health appointment with Howie Friedman, P.A.  AR 1236-47.  Plaintiff was experiencing anxiety as a result of chronic pain and had recently been contemplating suicide.  AR 1237, 1243.  She felt irritable and reported conflict with her husband and children.  AR 1243.  She had recently resumed smoking.  AR 1243.  Because her insurer had not approved the increased lithium dosage, Plaintiff was not taking the full amount prescribed.  AR 1237, 1243.  On November 14, 2016, Plaintiff admitted having missed several lithium doses since she last saw Mr. Friedman.  AR 1231.

On November 29, 2016, Plaintiff asked Dr. Sharma for a prescription for a cane and a handicapped parking card.  AR 1225.  Despite Dr. Sharma's attempts to convince Plaintiff that a pap test was the appropriate method of cervical cancer screening, Plaintiff insisted upon a referral to an oncologist for a biopsy.  AR 1225.

On December 8, 2016, Plaintiff told Mr. Friedman that she had weaned herself off her medications to have three days without medications "for school purposes."  AR 1219.  While not taking the medications, Plaintiff craved them but controlled her hallucinations by focusing on her project.  AR 1220.  Her symptoms severely intensified when she resumed normal dosage after the three days had passed.  AR 1220.

When Plaintiff saw Mr. Friedman on January 10, 2017, she and her family were living in a hotel pending repairs to their home after a major plumbing failure.  AR 1203.  Despite the resulting anxiety, Plaintiff reported feeling stable and less depressed.  AR 1204.  When Plaintiff was done "handling business," she visited a girlfriend to "break down" and play games.  AR 1204.  Plaintiff had set a goal to lose 50-55 pounds.  AR 1204.  Mr. Friedman changed the dosage of several of Plaintiff's medications.  AR 1204.  On that same day, Plaintiff had an intake interview for counseling at GVHC Senior Health and Wellness[25] with Sandra Perez, LCSW.  AR 1196-1202.  Plaintiff reported a recent increase in depressive symptoms and an impulsive [*sic*] gambling problem.  AR 1197.  Ms. Perez wrote:

///

---

[24] Plaintiff cut short her November 1 appointment to take her son to DMV and returned the following day.  AR 1236.
[25] GVHC Senior Health and Wellness appears to be a separate division of Golden Valley Health than the behavioral health area in which Mr. Friedman worked.

> [Patient] has been seen by psychiatry here, off and on for years. She has been seen previously for counseling with BHC who is no longer here. She stopped counseling when her former counselor and psychiatrist left, feeling like she was stable. Now she feels that some of her past depressive symptoms and anxious thoughts are returning.

AR 1197.

When Plaintiff saw Mr. Friedman on January 24, 2017, she had "forgotten" to change her medications to the new dosages. AR 1190. Plaintiff reported feeling more in control, less angry and more stabilized than in recent times. AR 1191. Mr. Friedman again adjusted Plaintiff's medications on February 6, 2017. AR 1184. On March 21, 2017, Plaintiff's symptoms were exacerbated by a move from the hotel to a temporary rental home. AR 1178. On March 31 and April 12, 2017, Plaintiff continued to report exacerbated symptoms. AR 1156, 1162.

On February 23, 2017, Plaintiff saw oncologist Imtiaz Malik, M.D., who opined that Plaintiff had been free of cervical cancer since surgery to remove early stage cancer in 1999. AR 1436. Dr. Malik wrote, "I do not see any benefit of her getting followed by me." AR 1436.

On July 24, 2017, Plaintiff reported feeling better. AR 1150. She had filed for separation from her husband and was sharing her home with a woman and her son. AR 1150. Plaintiff told Mr. Friedman that she sometimes saw visons of blood and wanted to stab something or cut herself. AR 1150. She also told Mr. Friedman that as a result of her childhood rape, she had three separate personalities. AR 1151.

On August 23, 2017, Plaintiff saw Ramaa Maruthachalam, M.D., for severe migraine. AR 1138.

## IV.     Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less

than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P,

Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.    Summary of the ALJ's Decision

Administrative Law Judge Frost-Wolf found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 31, 2012.  AR 18.  Her severe impairments included: migraine headaches, obesity status post gastric band, diabetes mellitus, neuropathy, asthma, degenerative disc disease and bipolar disorder.  AR 18. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526).  AR 19.

The ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(c) and 416.967(c), except that she was limited to non-complex routine tasks.  AR 21.  Plaintiff needed to avoid more than occasional exposure to extreme heat or cold, humidity, vibration and pulmonary irritants such as fumes, odors, dust, gases and other respiratory irritants.  AR 21.

Plaintiff was able to perform her past relevant work as a fundraiser.  AR 25.  In the alternative, she was able to perform other jobs in the national economy.  AR 26.  Accordingly, the ALJ found that Plaintiff was not disabled from December 31, 2012, through December 6, 2017 (the date of the hearing decision).  AR 27-28.

## VII.    Reliability of Plaintiff's Testimony

Plaintiff contends that the ALJ erred in concluding that her testimony was inconsistent with objective medical evidence in the record.  The Commissioner's response emphasizes that under the amended procedure set forth in S.S.R. 16-3p, the ALJ no longer considers whether a claimant's testimony is credible, but whether the claimant's subjective allegations are consistent with the objective evidence in the record.  As a result, Commissioner contends that the ALJ appropriately focused her analysis on the objective medical evidence and not on Plaintiff's subjective allegations of other criteria that are not relevant to the amended procedure.  Having

///

18

reviewed the record as a whole, the Court agrees that Plaintiff's account of disabling pain and other symptoms was inconsistent with the objective evidence of her symptoms and treatment.

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by "clear and convincing evidence." *Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014).

To determine whether the ALJ's findings are supported by sufficient evidence a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "[A] federal court's review of Social Security determinations is quite limited." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). "For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014), quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)) (internal quotation marks omitted). Federal courts should generally "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler*, 775 F.3d at 1098).

A claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an

///

1   endeavor to "determine how symptoms limit ability to perform work-related activities." S.S.R.

2   16-3p at 1-2.

3          An ALJ performs a two-step analysis to determine whether a claimant's testimony

4   regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014

5   (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); S.S.R 16-3p at 3. First, the

6   claimant must produce objective medical evidence of an impairment that could reasonably be

7   expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014;

8   *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that

9   Plaintiff's "medically determinable impairments could reasonably be expected to produce the

10  alleged symptoms." AR 22. The ALJ did not find Plaintiff to be malingering.

11         If the claimant satisfies the first step and there is no evidence of malingering, the ALJ

12  must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent

13  to which the symptoms limit an individual's ability to perform work-related activities." S.S.R.

14  16-3p at 2. "[S]ome individuals may experience symptoms differently and may be limited by

15  symptoms to a greater or lesser extent than other individuals with the same medical impairments,

16  the same objective medical evidence and the same non-medical evidence." S.S.R. 16-3p at 5. In

17  reaching a conclusion, the ALJ must examine the record as a whole, including objective medical

18  evidence; the claimant's representations of the intensity, persistence and limiting effects of her

19  symptoms; statements and other information from medical providers and other third parties; and,

20  any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5.

21  "The determination or decision must contain specific reasons for the weight given to the

22  individual's symptoms, be consistent with and supported by the evidence, and be clearly

23  articulated so the individual and any subsequent reviewer can assess how the adjudicator

24  evaluated the individual's symptoms." SSR 16-3p at *10.

25         Because a "claimant's subjective statements may tell of greater limitations than can

26  medical evidence alone," an "ALJ may not reject the claimant's statements regarding her

27  limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*,

28  242 F.3d 1144, 1147-48 (2001) (quoting *Fair v. Bowen*, 885 F.2d 597, 602 (9th Cir. 1989)). *See*

*also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* (internal quotation marks and citations omitted).

However, the law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of his or her analysis of the record as a whole, an ALJ properly considers whether the objective medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence"). The ALJ did so here, finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with medical evidence and other evidence in the record for the reasons explained in this decision." AR 22.

"[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." S.S.R. 16-3p at 6. Because objective medical evidence may reveal the intensity, persistence and limiting effects of a claimant's symptoms, an ALJ must consider whether the symptoms reported by a claimant are consistent with medical signs and laboratory findings of record. *Id.* For example, "reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, pain." *Id.* Conversely, records indicating that a claimant has no muscle wasting bely a

claimant's representation that he or she has been unable to walk no more than a few steps per day. *Id.*

The ALJ began her analysis with Plaintiff's allegations of repeated falls in stores, noting that the record did not document recurring falls. AR 21. Instead, the record revealed only Plaintiff's March 2017 representation to Dr. Duong of many recent falls (AR 1110), and a May 2016 report to Dr. Bernardi that her back pain had increased following a fall on a wet kitchen floor when she got off the treadmill (AR 1342). AR 21. At a September 2015 follow-up to her lap band surgery, Plaintiff reported no falls in the prior six months. AR 1010. (The ALJ did not note that although Plaintiff testified that store personnel repeatedly called EMS following her falls (AR 52-53), the record includes no evidence that Plaintiff was ever transported by ambulance to an emergency treatment facility following a fall.)

The ALJ also contrasted Plaintiff's subjective account with the June 2016 MRI indicating moderate multilevel arthropathy without disc protrusion or significant encroachment of the spinal canal or neural foramina (AR 1075); Mr. Barrett's report noting no back pain or myalgia (AR 819); Dr. Malik's assessment of "normal muscle tone/bulk, no deformities, normal range of motion, normal spine alignment" (AR 1436); and, Dr. Maruthachalam's assessment of normal cranial nerves, balance and gait (AR 1142). AR 22. In summary, the ALJ concluded that Plaintiff's back pain was not as severe as Plaintiff contended. AR 22-23.

The ALJ carefully summarized evidence undermining multiple alleged impairments. AR 21-22. Although Plaintiff's medical records refer to a chronic problem of neuropathy, the ALJ found that specific records belied that diagnosis reporting no cold intolerance (AR 828), and examination revealed a firm grasp, full strength in her lower extremities and deep tendon reflexes (AR 1124). The ALJ also found that although Plaintiff had experienced gestational diabetes during her most recent pregnancy, she required no medication thereafter and no consequential organ damage was noted. AR 22. Plaintiff had a history of asthma, but took no medication and had no observable symptoms (AR 649, 1435). The Court notes that the record includes no evidence that Plaintiff received continuing treatment for neuropathy, diabetes or asthma during the period relevant to the application for benefits.

Finally, the ALJ noted the record's documentation of alcohol abuse in remission, borderline intellectual functioning, diagnosis of bipolar disorder, depression and difficulty concentrating and concluded that Plaintiff's mental impairments were adequately addressed by the limitations included in the residual functional capacity determination.  AR 22.

As the ALJ found in this case, Plaintiff's claims of disabling impairments were inconsistent with medical records showing mild to moderate physical impairments .  The ALJ's determination was further supported by Plaintiff's failure to comply with medical treatment and recommendations, and evidence of her ability to provide her own personal care and engage in a wide range of activities.  *See* S.S.R. 16-3p at 7-9.  The ALJ elected not to discuss the inconsistencies in the symptoms Plaintiff reported to various physicians, sometimes on the same day.

As is always the case in an appeal of the Commissioner's denial of disability benefits, Plaintiff would construe the evidence differently than the ALJ.  Nonetheless, the hearing decision sets forth sufficient evidence in the record to support the ALJ's determination that Plaintiff's representations to the agency were not fully consistent with the medical evidence of record.  The Court therefore will not second guess the ALJ's assessment of Plaintiff's credibility.

**VIII.  <u>Assessment of Third-Party Lay Opinion</u>**

As noted above, the record includes a Third-Party Adult Function Report completed by Plaintiff's sister and three supportive letters from Plaintiff's personal friends.  The ALJ gave limited weight to the lay opinions "because of their high degree of subjectivity and their lack of medically acceptable standards."  AR 24.  Plaintiff contends that the ALJ erred in "disregarding" the lay opinions without a germane reason.  Doc. 21 at 48-49.  The Commissioner responds that the ALJ appropriately considered the lay opinions.

"[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify to her condition."  *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993).  Disregarding lay evidence without comment violates the regulatory provision that the Commissioner will evaluate evidence from nonmedical sources.  20 C.F.R. §§ 404.1513(a)(4), 416.913(a)(4).  However, "[a]n ALJ need only give germane reasons for discrediting the

testimony of lay witnesses." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

Inconsistency with medical evidence is a germane reason. *Id.* An ALJ also provides germane

reasons for rejecting testimony when the lay witness's testimony is substantively similar to other

subjective testimony that has already been validly rejected. *Valentine v. Comm'r Soc. Sec.*

*Admin.*, 574 F.3d 685, 694 (9th Cir. 2009). For example, an ALJ appropriately discredited a lay

opinion by explaining that it relied 'far too much" on Plaintiff's own allegations and was

contradicted by the record as a whole. *Bennett v. Colvin*, 202 F.Supp.3d 1119, 1135 (N.D.Cal.

2016).

     In this case, the ALJ examined each report from a friend or family member and

summarized its relevant information concerning Plaintiff's symptoms and function.[26] AR 24.

The ALJ then explained her reasoning for giving each lay opinion little weight:

> [B]ecause these other sources have no medical training to make
> exacting observations as to dates, frequencies, types and degrees of
> medical signs and symptoms, or the frequency or intensity of unusual
> moods or mannerisms, the accuracy of the information provided is
> questionable. Moreover, by virtue of the relationship with the
> claimant, I cannot consider these other sources disinterested third
> party witnesses. However, I have considered these opinions in terms
> of helping to understand the severity of the claimant's various
> symptoms over time as explained in SSR 06-03p (also see 20 CFR
> 404.1512 and 416.912). Even so, these reports from the claimant's
> relatives and acquaintances do not establish that she is disabled, and
> cannot carry the claimant's burden of proof. Therefore, I give only
> limited weight to these other sources assessing the claimant's current
> functional limitations because of their high degree of subjectivity and
> their lack of medically acceptable standards.

     AR 24.

The ALJ was not required to do more.

## IX.    <u>Analysis of Expert Medical Opinion</u>

     In Section C of her opening brief, Plaintiff challenges the ALJ's determination of her

residual functional capacity, contending that the ALJ erred in rejecting the opinions of treating

psychiatrist Dr. Simenson. The Commissioner disagrees, contending that the ALJ properly

rejected Dr. Simenson's opinion since the check-box opinions were unsupported and inconsistent

---

[26] The ALJ's analysis also considered the letter from Emmanuel Ministries concerning Plaintiff's volunteer work.
Plaintiff does not include that letter among the lay opinions that she contends the ALJ disregarded. AR 24.

with the evidence as a whole.  For the reasons discussed below, the Court agrees that the ALJ did not err in refusing to adopt Dr. Simenson's opinion.

In Section E, Plaintiff further contends that even though Mr. Barrett was not an acceptable medical source for her case (*see* 20 C.F.R. §§ 404.1502(a)(8), 416.902(a)(8)), the ALJ erred in giving little weight to Mr. Barrett's opinion that Plaintiff would be off task 25 percent of the workday and absent at least three days monthly.  The Commissioner responds that the ALJ did not err in giving little weight to the subjective opinion of one who is not an acceptable medical source, particularly since the objective record did not support Mr. Barrett's opinion.  The Court agrees.

## A.    Applicable Law

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.*; *Smolen*, 80 F.3d at 1285.  The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons.  *Id.* at 830.  However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

Physician assistants such as Mr. Barrett are not evaluated as if they were physicians.  A physician assistant is not considered an acceptable medical source under 20 C.F.R. § 416.913.[27]  Instead, physician assistants are considered to be "other sources."  20 C.F.R. § 416.913(d)(1)

---

[27] The Social Security Administration has recently adopted new rules applicable to claims filed after March 27, 2017, which expand the category of acceptable medical providers to include, among others, nurse practitioners.  20 C.F.R. §§ 404.1502(a)(6), (7), (8); 416.902(a)(6), (7), (8) (2017); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The revisions do not apply to Plaintiff's claim, which was filed January 19, 2013.

(listing medical sources that are considered other sources, including nurse practitioners, physician assistants, naturopaths, chiropractors, audiologists, and therapists). Unlike the opinions of physicians, the opinions of physician assistants are not entitled to special weight. An ALJ may reject the opinions of other sources by giving "reasons germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010). Factors used to evaluate a physician assistant's opinion include: (1) examining relationship; (2) length of treatment relationship and frequency of examination; (3) supportability of opinion; (4) consistency with the record; (5) specialization; and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 416.927 (c) and (f)(1).

### B. Medical Opinions

The administrative record includes numerous medical opinions of Plaintiff's mental and physical impairments and their effect on her residual functional capacity.

### 1. Agency Physicians

On initial review in May 2013, psychiatrist K. Loomis, D.O.,[28] agreed with the agency's recommendation and the consultative examiner's opinion that Plaintiff had minimal mental health impairment. AR 128. Dr. Loomis identified no restrictions of daily living, no difficulties in maintaining social functioning or concentration, persistence and pace, and not repeated episodes of decompensation of extended duration. AR 130. On reconsideration, F.M. Balson, M.D., agreed that Plaintiff had no severe mental health impairment. AR 154, 155.

Similarly, J. Bonner, M.D., concluded that Plaintiff had no severe physical impairments. AR 129. Dr. Bonner opined that Plaintiff's residual functional capacity was unlimited except for environmental limitations to be observed as asthma precautions. AR 131.

### 2. Consultative Examination—Internal Medicine

On April 27, 2013, Roger Wagner, M.D., performed a consultative medical examination. AR 699-703. Plaintiff's chief complaints were asthma, thoracolumbar back pain and diabetes mellitus, type 2. AR 699. Plaintiff told Dr. Wagner that she had received no treatment or x-rays

---

[28] In different references, the record identifies Dr. Loomis as an osteopath (D.O.) and a medical doctor (M.D.). AR 128, 132.

for back pain, could easily walk one-half mile and could sit for an hour.  AR 700.  Bending and lifting exacerbated her back pain.  AR 700.  The doctor observed that Plaintiff could easily get up from the waiting room chair and walk briskly, get on and off the examination table without assistance, easily bend at the waist to remove and put on socks and shoes, and could pick up a shoe on the floor from a standing position without bending her knees.  AR 700.  The examination revealed ability to walk on toes and heels, negative Romberg and straight leg tests and normal range of motion, sensation, gait, station and "finger-nose."  AR 701-02.

Dr. Wagner opined that Plaintiff was able to lift and carry 50 pounds occasionally and 25 pounds frequently.  AR 703.  Sitting, standing, walking and manipulative activities were not limited.  AR 703.  Plaintiff should stoop no more than frequently and because of her history of asthma, should avoid prolonged exposure to concentrated chemicals, dust, fumes or gases.  AR 703.

### 3.    Agency-Ordered Spinal X-Rays

Because Plaintiff had no prior spinal imaging,  the state agency ordered x-rays of her lower back.  AR 700.  Radiologist David Siffring, M.D., interpreted the x-rays and opined that Plaintiff's lumbar spine was normal.  AR 704.

### 4.    Psychological Assessment

Clinical psychologist Steven C. Swanson, Ph.D., performed a psychological assessment of Plaintiff on May 8, 2013.  AR 705-11.  Plaintiff told Dr. Swanson that she was a slow learner and received special education services.  AR 706.  She had a history of juvenile and adult imprisonment.  AR 706.  Although Plaintiff was currently unemployed, she had previously worked as a firefighter, salon assistant, exotic dancer, in-home caregiver and manager of a Taco Bell.  AR 706.  She had also worked for Emmanuel Outreach, Knotts Berry Farm, Bally Fitness, an employment recruiting office and the accounting office of Merced College.  AR 706.  She was independently able to perform all activities of daily living.  AR 707.

Plaintiff had never received psychiatric care.  AR 707.  Previously, she smoked and consumed alcohol heavily.  AR 707.  Medical issues included high blood pressure, asthma, migraine headaches and back pain.  AR 707.  She was successfully treated for cervical cancer in

1999 without recurrence.  AR 707.  Medications included Paxil, Propranolol, Imitrex, Topamax, QVAR and Ventolin.  AR 707.

Plaintiff was well groomed, pleasant, engaging, friendly and cooperative.  AR 707.  She was well oriented and displayed a full range of affect.  AR 707.  Form and content of thought were within normal limits.  AR 707.  Plaintiff displayed no evidence of delusion, perceptual disorder or psychosis.  AR 707.  Dr. Swanson observed no suicidal or homicidal ideation, and vegetative signs of depression were mostly absent.  AR 708.  Plaintiff displayed satisfactory concentration and attention.  AR 708.

Dr. Swanson administered the Wechsler Adult Intelligence Scale-4th Ed. (WAIS-IV).  AR 708.  Plaintiff achieved a full-scale IQ of 82, placing her in the borderline range of intellectual functioning.  AR 702.  Memory scale scores were consistent with the intelligence test results.  AR 709.  Dr. Swanson diagnosed:

| | | |
|---|---|---|
| Axis 1 | 305.00 | Alcohol abuse, in remission |
| | 305.10 | Nicotine dependence, in remission |
| Axis II | V62.89 | Borderline Intellectual Functioning |
| Axis III | | Obesity |
| | | Asthma |
| | | Hypertension |
| | | Headaches/Back Pain |
| Axis IV | | Unemployment |
| | | Raising Five Children |
| Axis V | | GAF = 66 (current) |

AR 710.[29]

///

---

[29] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health and illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994).  A score of 66 falls within the 61-70 range, which indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  *Id.* at 34.

Dr. Swanson found no evidence of psychotic symptomology or gross psychopathological disturbance.  AR 710.  He opined that "[Plaintiff's] mental and emotional functioning appears to fall within normal limits."  Dr. Swanson summarized:

> [Plaintiff] is judged able to maintain concentration and relate appropriately to others in a job setting.  She would be able to handle funds in her own best interests.  She is expected to understand, carry out, and remember simple instructions.  She is judged able to respond appropriately to usual work situations, such as attendance, safety, and the like.  Changes in routine would not be very problematic for her.  AR 710.  There do not appear to be substantial restrictions in daily activities.  Difficulties in maintaining social relationships do not appear to be present.

AR 710.

### 5. Mental Residual Functional Capacity Assessments by Other Sources

On June 9, 2014, Ms. Serrano opined that Plaintiff had marked limitation of her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to understand, remember and carry out detailed instructions to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and to respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to travel in unfamiliar places or use public transportation; and, to set realistic goals or make plans independently of others.  AR 984-85.  Plaintiff had moderate limitation of her ability to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to ask simple questions or request assistance; and, to be aware of normal

hazards and take appropriate precautions.  AR 984-85.  Ms. Serrano added that Plaintiff's bipolar disorder and anxiety impaired her social, occupational and inter-personal functioning.  AR 986. Plaintiff's prognosis was poor to fair.  AR 986.

On August 7, 2015, CalWorks counselor Jeremy Brownstein, ACSW, opined that Plaintiff lacked the tools and wellness to participate in activities and work.  AR 1082.  Plaintiff struggled engaging socially and in groups, was unable to perform various activities identified as "task completion," and lacked sufficient skills to handle stress and work independently.  AR 1082.

On December 23, 2015, Dr. Simenson added his signature to Ms. Serrano's opinion.  AR 997-99, 1083-85.

### 6.    Medical Source Statement: Physician Assistant

On July 1, 2015, Mr. Barrett completed a physical medical source statement.  AR 980-83. Plaintiff was diagnosed with bipolar disorder and migraine headaches with good prognosis.  AR 980.  Psychological factors contributed to the severity of Plaintiff's symptoms of headache and fluctuating mood.  AR 980.

In Mr. Barrett's opinion, Plaintiff could walk six to ten blocks without rest, and sit for at least 6 hours and stand for about four hours in an 8-hour workday.  AR 980-81.  She did not need to elevate her legs when sitting, or use an assistive device when walking. AR 981.  Plaintiff could lift twenty pounds occasionally and ten pounds frequently.  AR 981.  She could frequently twist and stoop, occasionally crouch, squat and climb stairs and rarely climb ladders.  AR 981.  She had no significant limitations of reaching, handling or fingering.  AR 981.  Plaintiff was capable of low stress work and would likely need one or two unscheduled breaks daily and be absent about three days per month.  AR 982.

### C.    The ALJ's Analysis

Because Dr. Bonner's opinion was offered in the initial review of Plaintiff's application for benefits and did not take into account Plaintiff's pain and later evidence, the ALJ gave partial weight to the doctor's opinion that Plaintiff had no exertional limitations, but should avoid concentrated exposure to pulmonary irritants.  AR 23.  The ALJ similarly gave little weight to Dr. Balson's opinion on reconsideration and partial weight to Dr. Wagner's consultative opinion,

finding that neither of those opinions adequately acknowledged later medical records establishing the severity of Plaintiff's back pain and headaches. AR 23.

Acknowledging that a reasonable argument could be made to limit Plaintiff to light work, the ALJ gave partial weight to Mr. Barrett's opinion to the extent that it supported the residual functional capacity that the ALJ determined. AR 23. However, the ALJ gave little weight to Mr. Barrett's opinion that Plaintiff would be off task during workdays and excessively absent, finding no support in the record for those portions of Mr. Barrett's opinion. AR 23.

The ALJ gave great weight to Dr. Swanson's opinion that Plaintiff's level of functioning would be limited by her borderline intellectual functioning but that she could understand, carry out and remember simple instructions. AR 23. The ALJ found Dr. Swanson's opinion to be internally consistent and consistent with the evidence as a whole and supported by specific references to medical evidence. AR 23. However, the ALJ gave little weight to Dr. Swanson's determination that Plaintiff's GAF was 66. AR 24-25.

The ALJ gave little weight to Dr. Simenson's opinion, expressed identically on three different occasions. AR 23-24. She wrote:

> All these forms appear to be the same. He stated that the claimant experiences poor concentration and poor memory, sleep disturbance, fatigued [*sic*], depressed mood, and psychomotor agitation; and that she also experiences high anxiety, constant worry, racing thoughts, and panic attack-like symptoms. However, his own treatment record from February 2015 noted that the claimant's psychiatric examination was normal with her being oriented to time, place, person and situation with no agitation, appropriate mood and affect, no increased activity, no mood swings, not paranoid, normal insight, normal attention span and concentration, no pressured speech and no suicidal ideation. His most recent treatment records from December 2015 and August 2016 had similar findings. Therefore, Dr. Simenson's opinion of Plaintiff's limitations is inconsistent with his own treatment record.

AR 23-24 (references to administrative record omitted).

### D. The ALJ Appropriately Analyzed Mr. Barrett's Opinion

Pointing to Mr. Barrett's having treated Plaintiff for migraine headaches, obesity, poor mobility, bipolar disorder and anxiety, Plaintiff contends that the ALJ erred in giving little weight to Mr. Barrett's opinion that Plaintiff would be off task 25 percent of the work day and would

miss about three work days each month.  Characterizing the disputed portion of Mr. Barrett's opinion as totally subjective and unable to be determined based on objective clinical findings, the Commissioner counters that the ALJ properly rejected that portion of the opinion since only an acceptable medical source could render an opinion without support in the treatment record.

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750.  An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record.  20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").  An ALJ may reject the opinion of any physician, including a treating physician, if the opinion is not adequately supported by the physician's own treatment notes and the record as a whole.  *See Chaudry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012); *Lusardi v. Astrue*, 350 Fed.Appx. 169, 172 (9th Cir. 2009).

Under the regulations applicable to Plaintiff's case, "[o]nly physicians and certain other qualified specialists are considered 'acceptable medical sources.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).  Physician assistants are considered 'other sources,' and the ALJ may discount their testimony so long as the ALJ gives germane reasons for doing so.  *Id.*  Because conflict between treatment records and medical opinions, such as the ALJ's finding that Mr. Barrett's records provided no support for his opinion, is a legitimate basis for rejecting an opinion of an acceptable medical source, such conflict must also be an acceptable reason for an ALJ's rejection of opinions from other sources such as physician assistants.

Plaintiff appears to contend that support for Mr. Barrett's opinion may be drawn from the ailments for which Mr. Barrett treated Plaintiff: migraine headaches, obesity, poor mobility, bipolar disorder and anxiety. Even in combination, however, Plaintiff's impairments do not, of themselves, necessarily lead to excessive absence or inability to focus on work responsibilities, particularly since Plaintiff received medication and other therapy to ameliorate the effect of these impairments.  The Court declines to second guess the ALJ's determination that the record did support Mr. Barrett's opinion that Plaintiff would be unable to concentrate for a full workday or avoid excessive absences.

**E.** **Dr. Simenson Did Not Prepare the Three Opinions Attributed to Him**

After finding that Dr. Simenson apparently rendered the same opinion on three separate occasions, the ALJ discounted Dr. Simenson's opinion as inconsistent with his treatment records. The Commissioner counters that the ALJ properly discounted Dr. Simenson's opinion since the regulations permit the ALJ to give less than controlling weight to an opinion of a treating physician that is not well supported and consistent with other substantial evidence in the record. The Court agrees that Dr. Simenson's treatment records did not support the check-box opinions attributed to him. Because the ALJ overlooked the factual background of the three apparently similar opinions, the ALJ failed to recognize that Dr. Simenson had not even prepared the opinions in question.

**1.** **Factual Background**

The ALJ identified three form opinions (Ex. 16F (AR 984-86), Ex. 19F (AR 997-99) and Ex. 26F (AR 1083-85)) as being the opinions of Dr. Simenson. AR 23-24. However, the first opinion (AR 984-86), dated June 9, 2014, was prepared by and signed only by social worker Rosalba Serrano. AR 986. On May 22, 2014, Ms. Serrano had noted that she needed to complete SSI paperwork on Plaintiff's behalf. AR 905. In the first hearing decision, dated September 10, 2015, original ALJ Cynthia Floyd discounted Ms. Serrano's opinion:

> On June 9, 2014, Rosalba Serrano, LCSW[,] completed a Mental Residual Functional Capacity Assessment (Exhibit 16F), which the undersigned gives no weight because it is in check box form and she does not provide adequate objective evidence such as mental status examination findings to support it. Furthermore, Ms. Serrano is not an acceptable source.

AR 180.

Despite her rejection of Ms. Serrano's opinion, ALJ Floyd found Plaintiff to be under a disability as defined by the Social Security Act. AR 182. In November 2015, the Appeals Council notified the parties of its intent to review the hearing decision. AR 282-89.

In his notes for Plaintiff's December 23, 2015, appointment, Dr. Simenson noted, "applied for disability about 4x, appealed the denial 3-4x, needs forms completed. Has form completed by

LCSW that requires MD signature." AR 1025. Accordingly, Dr. Simenson added his signature to Ms. Serrano's opinion but made no changes to Ms. Serrano's opinion. AR 999, 1085. The same countersigned form appears as both Exhibit 19F and 26F.

### 2. The ALJ Erred in Attributing the Opinions to Dr. Simenson

Understanding the opinions' origin clarifies the lack of evidentiary support in Dr. Simenson's treatment records. Even if the Court were to excuse the ALJ's oversight in light of the complexity of the extensive medical records in this case, the ALJ should have reviewed three opinions that "appear[ed] to be the same" (AR 24) in sufficient detail to recognize that Dr. Simenson did not prepare the opinions and did not sign the copy at AR 984-86. Simply put, the ALJ's inadequate review of the administrative record resulted in her erroneously attributing the opinions to Dr. Simenson.[30]

### 3. The ALJ's Error Was Harmless

An ALJ's error is harmless where it is "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). Although the ALJ failed to recognize the true nature of Dr. Simenson's purported opinions, she gave the opinions little weight since they were inconsistent with Dr. Simenson's records of treating Plaintiff. Because the ALJ gave little weight to the opinions, the result was substantially the same as it would have been had she rejected the opinions because Dr. Simenson not render them. A "court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti*, 533 F.3d at 1038 (citations and internal quotation marks omitted). In this case, the ALJ's giving little weight to the purported opinion had the same effect on the ultimate disposition of Plaintiff's disability applications as would have resulted from accurately recognizing that Dr. Simenson did not prepare the opinions.

///

///

---

[30] Having obtained Dr. Simenson's signature on Ms. Serrano's opinion, Plaintiff has to have known that Dr. Simenson did not prepare the three opinions in question. Nonetheless, she contends that the ALJ erred in failing to give controlling weight to opinions prepared by a treating physician.

1
2
3
4
5
6
7       **X.      Conclusion and Order**

8           Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not

9    disabled is supported by substantial evidence in the record as a whole and is based on proper legal

10   standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of

11   the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of

12   Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Silhouette

13   Gomez.

14   IT IS SO ORDERED.

15

16       Dated:   __**November 4, 2019**__              _____**/s/ Gary S. Austin**__
                                                       UNITED STATES MAGISTRATE JUDGE
17

18

19

20

21

22

23

24

25

26

27

28